## BANCO NACIONAL ULTRAMARINO v. FIRST NAT. BANK OF BOSTON.

(District Court, D. Massachusetts. April 16, 1923.)

No. 1428.

1. **Banks and banking ⊙⟹191—Letter of credit to be shown to obtain credit amounts to offer to honor draft purchased.**

   The ordinary commercial letter of credit contains authority to the beneficiary to draw a draft, and a promise to honor the draft, given either generally to bona fide holders or to some particular person, and if it shows it was for the purpose of being shown to obtain credit, and the purchaser is within the terms of the letter, it amounts to an offer that, if he purchases the draft, it will be honored, and the offer becomes a contract when the draft is negotiated.

2. **Banks and banking ⊙⟹191—Letter of credit designating particular beneficiary cannot be relied on by another.**

   If a letter of credit designates a particular person to whom the promise is made, no other person can take advantage of it, on the principle that a person has the right to select his own promisee.

3. **Banks and banking ⊙⟹191—Cable message held general letter of credit for benefit of bona fide holder of draft.**

   Where a cable message contained a summary of a general letter of credit mailed at the same time, and the purchaser of a draft relied on the cable message in purchasing the draft before the letter was received, the message, which formed the contract between the parties, subject only to explanation of ambiguity by the subsequent letter, and which directed the addressee to open a credit in favor of a firm, drafts, 15 days' sight, drawn on the sender, attached to shipping documents, amounted to a general offer to purchase the documents by honoring the drafts, and was not a mere request to the addressee to open a credit.

4. **Banks and banking ⊙⟹191—Omission of description of quality from invoice held to justify dishonor of draft under letter of credit.**

   Where the letter of credit required shipping documents to specify "Brazil white crystal sugar," the omission of that specification from the

usual shipping documents, which include a negotiable bill of lading, a consular invoice, and a commercial invoice, justified the bank issuing the letter of credit in dishonoring the draft attached to the documents, though the goods actually shipped conformed to the requirements of the contract, and other documents accompanying the draft established that fact.

5. Banks and banking ⊜⇒191—All conditions in commercial letter of credit must be strictly complied with.

All conditions contained in the offer of credit by a letter of credit issued by a bank must be strictly complied with.

6. Banks and banking ⊜⇒191—Purchaser of draft held to have relied on credit of drawer, not letter of credit.

Where plaintiff discounted the draft in suit for a customer, to whom defendant had issued a letter of credit before the shipping documents required by the letter of credit were issued, it must have taken the draft on the credit of the drawer, and not on the strength of the obligation of defendant drawee to accept it, and under those circumstances can stand in no better position than the drawer.

7. Banks and banking ⊜⇒191—Drawer of draft held required to furnish documents covering shipment from designated port.

Where a cable letter of credit made no reference to the shipping port, which was specified in the contract for the sale of the goods, and in the written letter of credit sent by mail, the drawer of a draft against the letter of credit, who had made the contract for the sale of the goods, and knew the buyer was to insure them as coming from a port specified in the contract, had no authority to draw against the letter of credit, except for goods shipped from that port, and neither he nor a purchaser of the draft who relied on his credit, and not on the letter of credit, can require acceptance of the draft accompanied by a bill of lading showing shipment from a different port.

8. Banks and banking ⊜⇒191—Failure to state ground of objection to draft not known, when it was dishonored does not waive objection.

An objection that a condition stated in a letter of credit requiring duplicate shipping documents to be sent to a designated individual was not complied with was not waived by the drawee's failure to specify it as a ground for dishonoring the draft, where the drawee had no knowledge of noncompliance with that condition at the time of dishonor.

9. Banks and banking ⊜⇒191—Presentation for payment, after 30 days, of 15 days' sight draft is of no avail.

Where a 15 days' sight draft was dishonored when presented for acceptance, a subsequent presentation for payment a month later was of no avail, under a letter of credit specifying a draft payable at 15 days' sight.

10. Bills and notes ⊜⇒489(7)—Count relying on absolute acceptance does not authorize recovery on condition of promise to accept.

Defendant is not liable under a count in a writ relying on an absolute acceptance of a draft, where its promise to accept the draft was conditional.

At Law. Action by the Banco Nacional Ultramarino against the First National Bank of Boston. Judgment rendered for defendant.

Thomas C. Bachelder, of Boston, Mass., for plaintiff.

Blodgett, Jones, Burnham & Bingham, and Norman W. Bingham, Jr., all of Boston, Mass., for defendant.

PETERS, District Judge. This is a suit on a bill of exchange drawn by Magalhaes & Co., of Rio de Janeiro, Brazil, on the First National

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Bank of Boston, in favor of the plaintiff, for $43,674.54, dated July 28, 1920, at 15 days' sight, protested for nonacceptance on August 30th, and for nonpayment on September 30th.

There are two counts in the writ. The first declares on the draft as an accepted draft by virtue of a promise to accept; the second, on the promise itself. The facts from which the plaintiff claims to recover for a breach of contract on the part of the defendant are substantially as follows:

On May 11, 1920, the Holbrook Grocery Company, of Keene, N. H., made a contract with Magalhaes & Co. for the purchase of some 300 tons of Brazil white crystal sugar, to be shipped from Rio to New York, about 100 tons in July and the balance a little later. The costs and freight to New York were to be paid by Magalhaes & Co., the sellers; insurance to be effected by Holbrook Grocery Company, the buyers, who agreed to take out a banker's letter of credit in favor of the sellers, covering the shipments, under which drafts were to be drawn at 15 days' sight, with complete shipping documents attached.

On June 29, 1920, the defendant bank, at the request of the buyer, mailed to the British Bank of South America, at Rio de Janeiro, the following letter of credit:

"No. 8451. Letter of Credit Not Exceeding $45,000.00. Details of this credit were cabled to the British Bank of South America, Limited, Rio de Janeiro, Brazil.

"The First National Bank of Boston.

"Boston, Mass., U. S. A., June 29, 1920.

"Messrs. Magalhaes e Company, Rio de Janeiro, Brazil—Dear Sir: We hereby authorize you to draw on the First National Bank of Boston, Massachusetts, at fifteen days' sight for any sum or sums not exceeding in total forty-five thousand dollars, for account of the Holbrook Grocery Company, for invoice cost of about 100 tons Brazil white crystal sugar @ 19½¢ per pound c. & f. New York, freight insurance here, including war risk, to be shipped from Rio de Janeiro, Brazil, to New York. Bills of lading for such shipments must be made to the order of the First National Bank of Boston, Boston, Massachusetts, and together with the invoices must accompany the drafts.

"A duplicate of such invoices with consular certificate attached, together with one copy of bills of lading and insurance certificates where required, must be sent by the bank or bankers negotiating drafts direct to Mr. E. H. Leland, Room 1800, 14 Wall street, New York City, by first mail, attaching to the draft a statement that such documents have been so forwarded.

"Bills of lading must be dated on or before September 15, 1920, and drafts must be drawn on or before September 15, 1920, and each and every draft under this credit must bear upon its face the clause 'Drawn under credit No. 8451, dated June 29, 1920, of the First National Bank of Boston, Boston, Mass.'

"The amount of each and every draft negotiated and date of negotiation must be indorsed hereon.

"We hereby agree with the drawers, indorsers, and bona fide holders of bills drawn and negotiated in compliance with the terms of this credit that said bills will be duly honored on presentation at our counter in Boston.

"Yours very truly,        The First National Bank of Boston,
"[Signed]                          C. C. McCauley, Asst. Mgr. For Dept.
"[Signed]                          Charles E. Spencer, Jr., Vice President."

On the same day, prior to the mailing of the letter of credit, the defendant bank cabled to the British Bank of South America, as follows:

"June 29th, 1920.

"To the British Bank of South America, Rio de Janeiro, Brazil:

"Open credit $45,000 favor Magalhaes e Company account Holbrook Grocery Co. drafts 15 days' sight drawn on us shipment about 100 tons Brazil white crystal sugar at 19½ cents per pound c. & f. New York Insurance here war risk included bladings to our order one set documents to E. H. Leland 14 Wall street New York expires September 15th Number of credit 8451 notify beneficiary."

On July 8th the British Bank of South America wrote Magalhaes & Co., at Rio, advising them of the receipt of the cable message and inclosing a copy.

On July 30th the British Bank of South America, having received the letter of credit of June 29th, from the defendant bank, mailed it to Magalhaes & Co., at Rio.

Meanwhile, on July 28, after the cablegram had been received, but before the letter of credit had arrived, Magalhaes & Co. drew on the defendant bank by the draft in question, discounted it with the plaintiff bank, and received credit for the proceeds, being a regular customer of that bank. No documents accompanied this draft which was sent by the plaintiff by mail to its agents or branch in New York.

On July 29th Magalhaes & Co. shipped from Bahia about 100 tons of sugar consigned to the defendant at New York. Certain shipping and other documents were prepared on account of this shipment and mailed by the plaintiffs' agents or branch at Bahia to the plaintiffs' branch in New York, where they were received on August 28th and forwarded to the National Shawmut Bank of Boston, to which bank, also, had been forwarded just previously the draft itself. Thereupon the Shawmut Bank, on August 30th, presented to the defendant bank for acceptance the draft in question, accompanied by the following supporting documents:

(1) A negotiable bill of lading, with the usual conditions, showing shipment at Bahia for New York, to the order of the First National Bank of Boston, of 1,693 bags of sugar, with no other description, except that in a descriptive indorsement the same bags appear to be marked "G" and to weigh 101,580 ks.

(2) A consular invoice showing sale by Magalhaes & Co. to Holbrook Grocery Company, to be shipped from Bahia to New York, consigned to First National Bank of Boston, "1,693 bags, sugar 101,-580ks," marked "G." "Price per unit, 22.44." Total, with charges, $43,674.34.

(3) A commercial invoice, showing similar sale, with description as follows:

"Mark 'G'—1,693 bags with 101,580 kilos sugar crystal equal to 223,972 lbs. Price per pound, $19.50. $43,674.54."

(4) A certificate, called "certificate of quality," from the office of the Ministry of Agriculture, Industry and Commerce, at Bahia, referring to this shipment of sugar, and describing it as crystal sugar of superior quality; date of certificate, July 27, 1920.

(5) A paper, apparently from the office of the inspector of municipal hygiene, the translation of which is as follows:

"Inspection of Municipal Hygiene.

"Department of Chemical Analysis and Bacteriology.

"Number of Entry, 24432.

Analysis.

Saccharose for polarisation...... 99.5

Impurities .................... 0.5·

_____

100.0

"Kind of sample: White crystal sugar, lot of 1,693 bags from Factory S. Lourenco, with the mark G; shipped by firm Magalhaes & Co. for New York by English Steamer Virgil.

"The sugar is of first quality.      [Signed]   Signature.

"Bahia, July 28, 1920.

"[Signed]   The Manager."

The draft itself presented for acceptance with the documents mentioned was refused and protested, the entry in the notice of protest reading:

"Refuse. Shipment from Bahia, instead of Rio de Janeiro. Invoice does not call for Brazil white crystal sugar. Our customer refuses consent to our acceptance."

On September 30 the draft was presented for payment, accompanied by the same papers with the addition of a memorandum by a warehouse administrator to the effect that from his books it appeared that 1,693 bags of superior crystal sugar, marked "G," went forward in the steamer Virgil bound for New York.

Payment was refused, and the draft protested for nonpayment, the reason as given in the notice of protest being, "Same reason existing for nonpayment as for nonacceptance."

It should be mentioned that, on August 30, 1920, E. H. Leland, 14 Wall street, New York City, agent in New York of the defendant, and referred to in the letter of credit, received by mail a nonnegotiable copy of the bill of lading and a copy of the consular invoice.

This action being for the breach of a contract, it is important at the outset to consider what the contract is, and with whom made.

1. Taking these questions in inverse order, with whom was the contract made?

The obligation of the defendant is contained in a cable message of June 29. The more full and detailed letter of credit, in common form and sent by mail, did not reach the beneficiary until after the negotiation of the draft which was negotiated, according to the testimony of the plaintiff's submanager, wholly on the strength of the cablegram and information received from its branch at Bahia that the shipping documents were in order. The only function of the letter of credit as a piece of evidence, as I view it, is to throw light on any obscurity in the cablegram as to the intent of the sender.

The defendant suggests, and asks for a ruling, that the cablegram was a request to the British Bank of South America to open a credit, and was not a letter of credit, that the plaintiff could act upon.

[1] The ordinary commercial letter of credit contains an authority to draw, given the beneficiary, and a promise to honor the draft, given either generally to bona fide holders or to some particular person. If

the letter shows that it was written for the purpose of being shown in order to obtain credit, and the purchaser is within the terms of the letter, it amounts to an offer that, if he purchases the draft, it will be honored. That offer or promise becomes a contract when the draft is negotiated.

[2] If the letter designates a particular person to whom the promise is made, it has been held that no other can take advantage of it, on the principle that a person has the right to select his own promisee.

This was the principle followed in Bank of Buchanan County v. Continental National Bank (C. C. A.) 277 Fed. 385, relied upon by the defendant, where a guaranty that a draft would be paid was addressed to a particular bank.

The reasoning of that and similar cases is that the intent of the guarantor to confine his promise to the person addressed is inferred from the fact of the address, and sometimes from other circumstances supposed to throw light upon the intent. In the last-mentioned case it is said:

"It is to be observed that in most of the cases cited the intention of the guarantor to confine his engagement to the person named is shown, not only by the formal address or superscription at the beginning of the writing, but is also shown by the use of some pronoun in the body of the guaranty, in phrases such as 'if you will furnish,' or 'which you may supply.'"

[3] In the instant case there is no occasion to grope around to ascertain the intent of the issuing bank. Its written letter of credit and cabled authority relate to the same transaction, and were written and sent the same day to the same person. The letter was full and explicit, and was an offer or promise to any bona fide holder of the draft. The cable message was an abridgment in terse language. Without the letter it might be reasonably argued that the intent of the sender of the cable message was to confine the offer to the adressee; but with the letter it is clear that any bona fide holder was intended, as is customary in such transactions.

The plaintiff has a right to rely upon the cablegram, if he brings himself within its terms.

2. What was the promise made by the defendant, which ripened into a contract when accepted according to its terms?

The cable message, freed from its abbreviations and interpreted in the light of the custom of merchants, may be fairly described as an offer to honor a draft of not exceeding $45,000, drawn on 15 days' sight against a shipment of about 100 tons of Brazil white crystal sugar at 19½ cents per pound, costs and freight paid to New York, shipping documents to accompany draft, with duplicate set to be sent to Leland in New York. Shipping documents in such a case according to the custom of merchants include a negotiable bill of lading, a consular invoice, and usually a commercial invoice. These documents are commonly in triplicate, sometimes in duplicate. In this case they would be at least in duplicate, as one set was to be sent to Leland in New York. The cable letter of credit amounted to an offer to purchase such documents.

The documents, or some one or more of them, should, in this case, call for shipment of "Brazil white crystal sugar," with other details as to price, quantity, etc., mentioned. As no mention was made in the cablegram of shipment from Rio, I doubt if defendant could complain that it was shipped from Bahia, nothing else appearing.

[4] The shipping documents described above in no case specify "Brazil white crystal sugar," so they were not the documents the defendant had offered to purchase, and the plaintiff cannot complain that the draft was not honored.

The defendant says that other documents accompanied the draft, which do show that shipment of "Brazil white crystal sugar" was in fact made.

It is immaterial what was actually shipped. On the part of the bank this was a contract calling for documents, not sugar. It was a contract for the usual documents—bill of lading and invoices. The defendant was not bound to take any notice of other papers that might be presented. A dozen affidavits might be presented, signed either by officials or private persons, to the effect that the sugar had been shipped according to the contract between the parties. The defendant would not be bound to notice them. Of course it might, with the consent of its customer, waive any of the terms of its offer. In this case it stands on its rights, and they are not uncertain. They are entirely independent of the contract between the parties for the purchase of sugar.

[5] In these cases of commercial documentary letters of credit it is absolutely necessary for the protection of the banking and mercantile community that all conditions in the offer of credit be strictly complied with. To that effect is the weight of authority. Int. Banking Co. v. Irving National Bank (D. C.) 274 Fed. 122; Lamborn v. Lake Shore Banking Co., 196 App. Div. 504, 188 N. Y. Supp. 162. See also article on commercial letters of credit, Harvard Law Review, April, 1922, and many cases therein cited.

The defendant bank, not having received the documents it offered in substance to purchase, was wholly within its rights in refusing the draft.

[6] When the plaintiff discounted the draft in question, no shipping documents accompanied it. Whatever there were at the time were in the plaintiff's branch at Bahia. The plaintiff's submanager testified that he had information that the documents were in order, but this information came to him in a letter from his branch, dated July 22. The bill of lading was dated July 27, the invoices July 28, and the certificate of the warehouse administrator shows that the sugar was taken out of the warehouse July 26—all subsequent to the letter of July 22. By that letter the plaintiff could have received no knowledge of a fact that did not then exist; consequently it must have taken the draft on the credit of the drawer, and not on the strength of the obligation of the drawee to accept it. It did not rely on the offer of the defendant contained in any letter of credit, but rather on the personal responsibility of the drawer.

[7] Under these circumstances the plaintiff can stand in no better position than the drawer, who knew that his contract called for Brazil

white crystal sugar, to be shipped from Rio. The cablegram of credit under which he drew did not specify this detail of the place of shipment; but it was sent to Rio and delivered to a person who had contracted to ship from Rio, and who knew that the buyer was to insure the cargo as coming from Rio, and that the buyer was to furnish a letter of credit covering a shipment from Rio, with a provision that the usual shipping documents should accompany the draft. The cable was an advance advice of the letter of credit, with nothing showing any intention to change the port of shipment previously agreed upon. When the drawer read the message, in the light of his knowledge of the situation it must have meant to him, as the letter of credit, subsequently arriving, unquestionably meant, that the shipping documents should specify Brazil white crystal sugar from Rio. The drawer received no authority to draw under any other circumstances. If he drew on the chance that the documents showing shipment from Bahia would be accepted as a good compliance with the terms of the credit, he would have to accept the result, and so must the plaintiff who stands in his shoes. Murdock v. Mills, 11 Metc. (Mass.) 5, 13.

[8] One condition specified in the cablegram authorizing the draft was that one set of shipping documents should be sent to one Leland in New York. That condition was not complied with. It is not mentioned as a reason for nonacceptance of the draft in the notice of protest, but it was not known to the defendant at the date of presentation for acceptance that Leland had only received certain copies, and therefore there was no waiver by the defendant. Bates v. Cashman, 230 Mass. 167, 119 N. E. 663.

[9] The presentation for payment a month later was of no avail, as the credit specified a draft payable at 15 days' sight.

[10] It cannot be seriously claimed that the defendant is liable on the first count in the writ as an absolute acceptor because its promise to accept was from no point of view unconditional. Germania National Bank v. Taaks, 101 N. Y. 442, 5 N. E. 76.

It follows that judgment must be rendered for the defendant.