**CALORIC STOVE CORP. v. CHEMICAL BANK & TRUST CO.**

No. 223, Docket 22637.

United States Court of Appeals
Second Circuit.

Argued April 17, 1953.

Decided June 22, 1953.

Jonas J. Shapiro, New York City, Janet Perlman, New York City, of counsel, for plaintiff.

John A. Wilson, New York City, Shearman & Sterling & Wright, New York City, Michael J. DeSantis, New York City, of counsel, for defendant.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Both parties appeal from a judgment for the plaintiff in an action to recover money, deposited by it with the defendant bank, to be drawn upon by one, Carbana, from whom the plaintiff had contracted to buy a shipment of fabricated steel. The complaint was in three counts, of which, however, only the second need concern us here, because although the third count was also submitted to the jury, the verdict upon its stands or falls with that on the second. The question on the defendant's appeal is whether the judge should have directed a verdict in its favor, both at the close of the evidence and thereafter, notwithstanding the verdict. The question upon the plaintiff's appeal is: (1) whether the judge should have directed a verdict for the full amount of the deposit, less the plaintiff's salvage upon disposing of the steel delivered to it by Carbana; and (2) if not, whether a new trial should be granted, though limited to the issue of damages, for errors in the admission of evidence and because of the inadequacy of the award.

The facts in outline were as follows. The plaintiff, whose president was Klein, hearing from a broker, Madrigan, that a lot of about 300 tons of steel was on the market, made a contract for its purchase through him. Klein was to furnish the seller with a letter of credit to finance the purchase, and on May 13, 1947, he wrote to the defendant bank, enclosing the plaintiff's cheque for $65,250 to be paid "against presentation of Commercial Invoice and Railroad Bill of Lading, evidencing the shipment of 300 tons * * * of rolled prime steel sheets," described by number and gauge. On May 14, Klein and Miller—who conducted the transaction for the bank—had an interview, the testimony as to which we discuss in detail later; and Klein signed an "application" for a letter of credit upon one of the bank's standing forms. In addition to this "application" Miller required a written statement (Exhibit B), collateral to a proposed letter of credit, providing in detail the duties of the "applicant" and the protective exemptions of the bank. Klein signed this paper also and Miller took both documents away with him to prepare the letter of credit on which he insisted. However, the bank's employees, who were charged with preparing the letter, delayed doing so and it was not ready by the 16th. On that day Carbana, the buyer, appeared at the bank with two documents, upon delivery of which the bank paid out the whole deposit of $65,250; of which Carbana received $57,000, and for the balance—$8,250—the bank made out a cheque to Madrigan's order, which he asked it to hold until he called for it. As we have said, no letter of credit had been delivered to Klein before these payments were made; nor indeed had any been prepared.

The documents that Carbana delivered were (1) an invoice describing the steel in the same terms as those contained in Klein's letter of May 13th, and (2) a bill of lading to Carbana's order, endorsed by him, describing the shipment only as 300 tons of steel, though giving the car numbers. On the bill was stamped: "Shipper's load and count." The bank mailed these documents to the plaintiff at once and they arrived on the 20th. The cars themselves reached the plaintiff's factory on the 21st and 22nd, and Klein on examining the steel thought that it did not correspond with his contract with Carbana, and on the 21st he called up Miller and expressed his indignation that the bank should have paid for such a delivery. It was not, however, until the 29th that he protested that the documents did not correspond with his instructions to the bank. As Carbana refused to take back the steel, the plaintiff finally sold the whole shipment to the highest of three bidders, whose bids Klein obtained through a broker. The net recovery or salvage from this sale was $7,492.54, which the plaintiff requested the court to charge the jury to be the largest amount allowable as a set-off. The jury brought in a verdict for the plaintiff of $28,500; whereupon the plaintiff which had asked for the direction of a verdict for the full amount less the salvage, renewed that motion, and in the alternative moved for a new trial on the issue of damages alone. We shall first take up the defendant's appeal which rests upon the denial of its motion for a directed verdict; and, next, the plaintiff's appeal, directed to the inadequacy of the award.

### Defendant's Appeal.

Klein testified that at the interview on May 14 he asked Miller to finance the purchase from Carbana of "cold rolled prime steel sheets" of specified sizes and quantities,—Miller to pay drafts drawn by the seller upon the shipment which was to be made before May 20. This was in accordance with his letter of May 13th; but Miller refused, saying that the transaction must be by letter of credit in due form. Klein agreed, and Miller required him to sign the "application for a letter of credit" (Exhibit 3), which called for payment on an invoice from Carbana and a "railroad bill of lading": the invoice, to describe the steel in the same terms as in Klein's letter of May 13; but the bill of lading described only as "railroad bill of lading to order of Caloric Stove Corporation." At this same interview Klein also signed the collateral written agreement, Exhibit B, that we have mentioned, of which the important part was that, if the documents on which the bank

should pay the seller were not in accordance with the "credit or instructions," Klein must protest "immediately," or he would "waive" any discrepancy. Klein swore that he did not read Exhibit B, or take a copy of it, and that he returned it to Miller; and the jury might have found that this was because Miller told him that the letter of credit would come along that same night with the other papers. As we have already said, no letter of credit was delivered, nor was Exhibit B returned to Klein before the bank had paid out the money.

After verdict we must accept it as true that Klein did tell Miller on the 14th that the bill of lading must contain the same specifications of the steel as the invoice; and, if so, the payment to Carbana did not conform to the conditions that Klein had imposed as to the bill of lading, and the variance was material. Since the bank on that hypothesis had not followed its instructions, it was obliged to show some reason why Klein had disabled himself from invoking its default; and this it tried to do in two ways. It alleged (1) that Exhibit B was part of the contract and that Klein was bound to protest "immediately" upon receipt of the bill of lading on May 20th that it did not conform to his instructions; and it alleged (2) that, even if Exhibit B was not part of the contract and if Klein had not read it, nevertheless his delay estopped him from raising the objection. The first defense might have been good, even though the jury believed that Klein never read Exhibit B, if it was a contract between the parties, for the law of New York in this regard is the same as the general law of contracts: *i. e.,* if a party to a written contract signs it, he is bound by its terms, whatever these may be. Pimpinello v. Swift & Co., 253 N.Y. 159, 170 N.E. 530. That doctrine depends, however, upon the premise that the signer gives the other party to understand that he means to be bound by its contents; and this in turn presupposes that the party signed in such circumstances that the opposite party might justly assume that the signer meant to assure him that he might rely upon the signer's acceptance of its contents. In the case at bar it was for the jury to decide whether there had been such a setting. They may

well have believed Klein's testimony that Miller would deliver to him the proposed letter of credit and Exhibit B on the night of the 14th; and that the letter of credit would be in the same terms as the invoice, and would be issued directly to the plaintiff. If they did so believe, Miller had no warrant for supposing that by signing Exhibit B Klein meant him to understand that it was at once to become an independent contract. And this is true, notwithstanding the provision in the exhibit that any failure by the "undersigned" to protest "immediately" should constitute a "waiver" of any "variation," not only between "the documents" and the "credit," but between them and any "instructions of the undersigned." Although we were to assume *arguendo* that this covered "instructions" dehors the documents, it was ineffective to "waive" any "variation" whatever, unless the exhibit became a contract, regardless of the issuance of the proposed letter. That it did not become so followed, not only from Miller's refusal to deal with Klein except upon the basis of a letter and from Klein's version of their interview; but also from the very language of Exhibit B itself. At its outset it recited that the agreement of "the undersigned" was made "in consideration of the acceptance of payment" by the bank of any drafts "at the request or for the account of the undersigned or under any Letter of Credit issued at the request of the undersigned * * * *and in consideration of the issuance of any such Letter of Credit* * * * and in consideration of any loans and advances made by the Trust Company to the undersigned." The consideration for the "waiver" had not been entirely performed when the payments were made; and it never was performed, because even the letter of credit later proffered to the plaintiff did not conform to Klein's version of his interview with Miller. Klein, having signed and delivered the exhibit subject to these conditions, was not bound if he did not read it.

So much for the bank's defence that Klein engaged by contract to protest "immediately" against any "variation" between the documents and his "instructions" to the bank. The second defence, as we have said, is that his delay estopped him.

Since he did not know that the bank supposed that he must raise the objection in order to avail himself of its failure to conform to his instructions, the bank must maintain that the delay, *ipso facto,* excused it upon principles of equity. However, the bank failed to prove that the delay prejudiced its recourse over against Carbana or anyone else; so far as appears, it was in as good a position on the 29th as it would have been on the 20th when the plaintiff received the documents. It is indeed difficult to see on what theory a jury could have found that a delay of nine days was a representation that Klein meant not to invoke the "variation"; and it is quite impossible to see how that could be an issue that the judge should have taken from them. However, that aside, and assuming that there was a misrepresentation, in New York, as elsewhere, "no estoppel arises where there has been no act done, and no change of position in reliance upon an untrue representation." Wills v. Investors' Bank Stocks Corporation, 257 N.Y. 451, 458, 178 N.E. 755, 78 A. L.R. 1013; Byrne v. Barrett, 268 N.Y. 199, 208, 197 N.E. 217, 100 A.L.R. 680. Thus it appears that in no aspect should the motion for a directed verdict have been granted, and on the defendant's appeal the judgment must be affirmed.

### The Plaintiff's Appeal.

As we have said, the plaintiff requested the judge to charge that the amount of its salvage upon the sale of the steel received from Carbana was the largest possible set-off permissible. Apparently, this was on the theory that § 141 of the New York Personal Property Law, McKinney's Consol. Laws, applied to the situation. Even if it had applied, the seller's right as there defined, depends upon his having sold the rejected goods "with reasonable care and judgment"; and it would have been a clear invasion of the jury's function to decide that the plaintiff's disposal of the goods necessarily conformed to the standard. Furthermore, the situation at bar was certainly not within § 141, for Klein was not a seller, but a buyer. It does not indeed follow that his remedy should not by analogy conform to the remedy that § 141 gives the seller.

Maybe it should, but, even so, there would be no possible warrant for making it more extensive than the statutory remedy, and the issue would still be whether Klein disposed of the goods "with reasonable care and judgment."

The plaintiff next complains of the competency of Factor's testimony that the steel delivered had a market value of $33,000. There can be no doubt that Factor was qualified by his acquaintance with the subject matter to give an opinion as to the value of such steel as was described in the invoice. The chief challenge is that the defendant did not properly prove that the steel which Factor appraised at $33,000 was in fact steel of the same quality and quantity as that which the plaintiff received. (In discussing this it is well to have in mind that, as to questions of evidence, the state law does not apply—rule 43(a), 28 U.S.C.A.,—but that the test is which is the more favorable to admission: the state law, or the law of evidence at a hearing in equity in a United States court.) Upon the question of quantity the evidence was that the bill of lading, on the basis of which Factor made his appraisal, was prepared by one, Bell, an employee of the corporation of which Factor was president. Bell swore that he made it out at Carbana's dictation, but that Factor saw it within a very few minutes after it was typed. Factor swore that he had given Bell a paper that contained what Bell put in the bill, and that he was the only person present when Bell typed it. It did not, however, appear how Factor ascertained the weight; and it did appear by other evidence that the weight of the shipment was about 255 tons instead of 300. Assuming for argument that the quantity should have been taken at 255 tons, the difference was negligible as will appear, when we discuss the refusal to grant a new trial. So far as concerned the correspondence of the quality of the steel as stated in the invoice with the steel delivered, the testimony was as follows. Bell made up the invoice as well as the bill of lading, and it described the quality of the steel; but nobody asked him who gave him the information. However, Factor swore that he saw the steel, as it was being put on board the trucks at the corpo-

ration's yard to be carried to the Bush Terminal to be loaded in the cars. It is true that he did not watch each truck as it was being loaded, but he was about the yard while the loading was going on. He also swore that he had examined the steel as it lay awaiting disposal, and that it was of the kind described in the invoice. That was certainly foundation enough to support the admission of his appraisal in point of quality. Whether the jury would accept it was another matter.

So much for any error in the admissibility of evidence, or in denying a peremptory charge upon the amount of the permissible set-off. There remains the question whether it was error to deny the plaintiff's motion for a new trial because of the inadequacy of the award of damages. On appeal from the final judgment such an order may be reviewed, and courts have often assumed that it may be a basis for the reversal of the judgment, if the lower court has "abused its discretion," whatever that may mean. When, however, the error is that the evidence did not support the award, it is at least doubtful whether it can ever so result. In Miller v. Maryland Casualty Company, 2 Cir., 40 F.2d 463, we said that, if the award exceeded the statutory limit, or did not equal the conceded amount, or, if it appeared that the jury had not considered the issue, the award should not stand; but we were doubtful if the review extended further. That was in 1930, and in 1932 the Supreme Court circumscribed even this in a decision that has remained untouched.[1] The action was by the seller to recover damages for the buyer's refusal to accept twelve installments of coal; and the evidence was that the highest market price of such coal throughout the period of delivery was substantially lower than the contract price.

The jury brought in a verdict for the seller, but for only one dollar; yet the court refused to treat the district judge's refusal to set aside the verdict as reviewable, and indeed left it open (page 485) whether such a refusal could ever be an abuse of discretion. Moreover, it said (p. 485), in apparent justification for not disturbing the verdict, that it "may have represented a finding for the defendant on those issues; the reason for the award of nominal damages may have been that the jury wished the costs to be taxed against the defendant."

It is quite true that it is impossible upon the testimony here to justify an award of $28,500. Even though we accept Factor's figure of $33,000, $32,250 would remain unpaid out of $65,250 and the award of $28,500 was short $3,750. Moreover, if the tonnage delivered was only 255 tons this would have been increased by $2,805, making a shortage of $6,555. Nevertheless, it was less irrational to award somewhat lower damages than the lowest that the evidence justified, than it was to award only nominal damages when substantial damages were the necessary consequence of a verdict for the plaintiff. The situation is one in which the only relief rests in the discretion of the district court. Indeed, appellate courts, at least in the federal system, are increasingly prone to recognize that, although trial by jury must be conducted in accordance with the rules appertaining to it, it is a hopeless quest to search nicely into what considerations may have entered into the verdict. In criminal prosecutions they will pry more deeply, but in civil actions they are aware that the chance of a better result upon a new trial may not justify the delay and expense that it would involve.

Judgment affirmed.

1. Fairmont Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439.