**BANCO ESPANOL de CREDITO,**
Plaintiff, Appellant,

v.

**STATE STREET BANK AND TRUST COMPANY, Defendant, Appellee**
(two cases).

Nos. 6938, 6939.

United States Court of Appeals
First Circuit.

Nov. 7, 1967.

Harold M. Willcox, Boston, Mass., with whom Charles C. Cabot, Robert E. Sullivan, and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., were on brief, for appellant.

Charles F. Choate, Boston, Mass., with whom Mark A. Michelson and Choate, Hall & Stewart, Boston, Mass., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This suit began as a claim by appellant, a Spanish bank (Banco Espanol), against appellee, a domestic bank (State Street), for the latter's allegedly wrongful refusal to accept and pay two drafts drawn upon it pursuant to two irrevocable commercial letters of credit. Each letter was issued by State Street at the behest of its customer, Robert Lawrence, Inc. (Lawrence), a Boston clothing concern. Banco Espanol was designated the advising bank and two Spanish suppliers (Alcides and Longuer) were named as beneficiaries. The cases were consolidated for trial in the district court, sitting without a jury and, following judgment for State Street, appellant took these appeals.

The issue, is whether State Street, whose letters of credit, as amended, called for the presentation of an inspection certificate by a named firm stipulating "that the goods are in conformity with the order", was justified in refusing to honor the drafts of Banco Espanol on the ground that the inspection certificate did not meet the terms of the letters of credit.

The transaction was initiated by Lawrence to finance the purchase of raincoats, beach jackets, knit shirts, and cardigans from Alcides and Longeur. Based upon preliminary arrangements apparently worked out by an intermediary, of which more later, Lawrence obtained two irrevocable letters of credit from State Street. One letter covered Lawrence orders Nos. 101, 102, and 103 for beach jackets, outer coats and cotton garments in the revised final amount of $105,630, and the other covered Lawrence order No. 100 for wool knit shirts and cardigans in the revised final amount of $13,320. Both letters constituted Banco Espanol the correspondent bank, and required signed invoices, customs invoices, inspection certificates, and full sets of clean on board ocean bills of lading dated not later than March 31, 1963.

At the time of issuance of the letters of credit, State Street called to the attention of its customer, Lawrence, that the requirement of an inspection certificate without a named inspector left a hazardous gap in the documents. Lawrence replied that the letters would be later amended to include the name of an inspection agent.

The next three and one half months were significantly devoted to continuing efforts to resolve this problem. On November 22, 1962 one of the Spanish manufacturers (Alcides) wrote Lawrence's representative that it agreed with the idea of naming an inspection agent and suggested that Lawrence put forward a name. Lawrence's man replied shortly that since he would be in Barcelona near the time of delivery, he would be the inspector. Accordingly, State Street sought to amend the letters in January. Foreseeably, this was not acceptable to the beneficiary, as Lawrence learned in early February. Lawrence then wrote State Street (notwith-

standing the hiatus in the letters of credit which State Street had noted) that it should not make payment unless inspection certificates were signed by a party acceptable to it. It further agreed to indemnify State Street for any damages resulting from carrying out these instructions, coupling this with a threat to refuse reimbursement if payment were made.

After a meeting between Lawrence and State Street, the object of which was to decide what to do about the inspection issue, a representative of Lawrence went to Spain. This trip resulted in an amendment to the letters of credit, cabled to Alcides on March 1, 1963, which required the inspection certificate to be issued by Supervigilancia Sociedad General de Control S.A. (Supervigilancia) certifying that "the goods are in conformity with the order". While it is not clear on whose initiative this firm was selected, it was apparently well regarded by the State Street official who had been closely associated with this transaction.

Identification of the underlying orders to which the letters of credit referred is not an easy task. In the first place, the record before us contains no document purporting to be an order for the shirts and cardigans (No. 100—the Longuer order). As to the Alcides order, we face two sets of somewhat inconsistent documents, both of which Lawrence sent to the manufacturer: two unnumbered papers dated November 5, and 6, 1962, labelled "order placed by Cavendish Co." —apparently an intermediary for Lawrence; and three papers dated November 13, 1962, labelled "stock sheet", and bearing numbers 101, 102, and 103. Though the earlier set is the only one bearing the label "order" there is evidence both external and internal that it was superseded by the latter: a reference in a letter from Lawrence's representative that he had to create orders to match the numbers in the letters of credit; a reference in another letter to asterisks in the orders—which are found only in the "stock sheets", not in the "orders"; additional documentary requirements in the "stock sheets", not found in the "orders"; and a major change in half the sizes specified in one "order", from "small" to "medium". We cite such minutiae because of the difficulty of interpretation created by Lawrence and because of the assertion of appellee's counsel at trial that the inspecting agency could not determine what the orders were. Leaving aside consideration of what might be the legal effect of a buyer-created impossibility of clear identification of orders where a letter of credit required a certificate of conformity to order, we simply observe here that close scrutiny of the two sets of papers reveals that the "stock sheets" supplanted the earlier "orders".

In any event the most important notation found on the "stock sheets"—and not on the "orders"—was "Coats [and jackets] to be as sample inspected in Spain. Letter of credit to be cashed by presentation of bill of lading and signature of superintendent or local inspection (buyers preference) (will confirm)."

The amendment to the letters of credit —appointing Supervigilancia the inspecting agent—was accepted by the major manufacturer involved—Alcides (and presumably Longuer)—on March 12, 1963 on which date both manufacturers requested Supervigilancia to begin inspection. State Street notified Lawrence on March 13.

Then began a barrage of cabled messages from Lawrence to both Supervigilancia and the manufacturers, which was to endure for two weeks. On March 13 Supervigilancia was asked, without explanation, to delay inspection until further instructions from Lawrence. On March 14, it was told that Lawrence had cabled the manufacturers to postpone shipment to permit Supervigilancia to inspect according to samples "they air mailing you directly". On the same day another cable was sent to Supervigilancia saying that Lawrence was airmailing "our approved samples per order and instructions". On the next day Supervigilancia was told to obtain three complete sets of samples properly marked from each concern, send two to Lawrence,

and await instructions. On March 18 this message was repeated.

After these two conflicting sets of instructions, Supervigilancia, on March 23, cabled Lawrence, saying in effect that it was going ahead, acting "according your own indications on credits and orders". To this Lawrence replied on March 25 that Supervigilancia should "withhold certificate until after arrival and inspection of goods by your New York correspondent * * *." This, if we read it aright, is a third position taken by Lawrence. At this point in time the latest date for completion of the bills of lading was five days away, March 31, with no alternative shipping date available within that period.

Supervigilancia, on March 26, executed its two certificates of inspection. It divided each certificate into two parts. The first part tended to the matter at hand saying that (1) it had carried out its inspection

"* * * basing ourselves on the details shown in the orders or Stock-sheets Nos. [100], 101, 102 and 103 * * * and in the samples that were handed to us by the Requirer [Alcides and Longuer], that corresponded, according to his sayings ratified in presence of a Public Notary, to the samples seen and approved by the Delegate of Firm ROBERT LAWRENCE INC, during his stay in Barcelona, and with [sic] are mentioned in the notes appearing in orders Stock-sheets Nos. [100], 101, 102 and 103, where there is a note reading:

'COATS or JACKETS [Germents (sic)] TO BE AS SAMPLE INSPECTED IN SPAIN' ";

that (2) the letters of credit required it to certify "THAT THE GOODS ARE IN CONFORMITY WITH THE ORDER"; that (3) a ten per cent random sample had been taken; and that (4) the "whole * * * [was] found conforming to the conditions estipulated [sic] on the Order-Stock-sheets."

The second part of each certificate contained a chronological account of the cabled messages we have summarized, followed by this language: "Requirer * * * is formally requiring us for delivering this certificate what we are doing today under reserves, not as far as the goods are concerned, which correspond to the samples seen and produced referred to at the beginning of this certificate, but to the existing difference between both interested parties as per the quoted cables."

All documents were presented to Banco Espanol, which honored, them and made payment or the equivalent on March 28 and 29. On April 3 State Street cabled its refusal to accept the drafts on it "because accompanying inspection certificates non conforming with terms of credits which require certificates certifying goods are in conformity with the orders". A later letter amplified its position by specifying that the certificates merely indicated conformity to samples alleged by the seller to "correspond" to other samples allegedly approved by the buyer and that the certificates were issued "under reserves".

The district court sustained this position, referring to the requirement that documents strictly conform to letter of credit provisions, and pointing out that each certificate failed in three respects: (1) that it merely certified that the goods conformed to "conditions"—which left it unclear if the conformity was to the whole of the order or only part; (2) that there was a doubt whether the "order-stock-sheet" was different from the order; and (3) that the certificate was confined to samples handed to the inspecting agency by a representative of the manufacturer. The court concluded that "* * * this was not the unqualified certificate required by the letter of credit and defendant bank was justified in its refusal to accept it."

We do not agree. Since, in our view, the third alleged defect noted by the court presents the most difficult problem, we shall deal with it first.

We note, at the outset, that an issuing bank's duty to honor a demand for payment is, to some extent, determined by

statute. The Uniform Commercial Code, Mass.Gen.Laws ch. 106, § 5–114(1) (1958), provides, in relevant part, that "An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary."[1] This Code provision, however, simply codifies longstanding decisional law and does not assist us here in determining whether the inspection certificate submitted by Supervigilancia complied with the terms of the credit.

■ We take as a starting point the substantial body of case law which establishes and supports the general rule that documents submitted incident to a letter of credit are to be strictly construed.[2] This is because international financial transactions rest upon the accuracy of documents rather than on the condition of the goods they represent. But we note some leaven in the loaf of strict construction. Not only does *haec verba* not control absolutely, see, e. g., O'Meara v. National Park Bank, 239 N.Y. 386, 146 N.E. 636, 39 A.L.R. 747 (1925), but some courts now cast their eyes on a wider scene than a single document.[3] We are mindful, also, of the admonition of several legal scholars that the integrity of international transactions (i. e., rigid adherence to material matters) must somehow strike a balance with the requirement of their fluidity (i. e., a reasonable flexibility as to ancillary matters) if the objective of increased dealings to the mutual satisfaction of all interested parties is to be enhanced.[4] See, e. g., Mentschicoff, How to Handle Letters of Credit, 19 Bus.Lawyer 107, 111 (1963). Finally, we recognize that this is not a litigation about the nomenclature of goods. Consequently, we are not measurably helped by such cases as those cited in the margin which turn on discrepancies between the actual terms of invoices or bills of lading and requirements of a letter of credit.[5]

1. The district court noted that
    "Both parties appear to agree that the case is governed by the Uniform Commercial Code as enacted in Massachusetts. Plaintiff [appellant] also relies upon the Uniform Customs and Practice for Documentary Credits issued by the International Chamber of Commerce, particularly Article 8 thereof. This, however, in substance states only what is contained in the Uniform Commercial Code."

2. See Moss v. Old Colony Trust Co., 246 Mass. 139, 152, 140 N.E. 803 (1923) and cases collected in n. 5, infra.

3. For example, we observe that a leading authority standing for confining scrutiny to a single document, J. H. Rayner & Co. v. Hambro's Bank, Ltd., [1943] 1 K.B. 37, seems to have mellowed to a disposition to look at the several documents presented to the negotiating bank as a whole. Midland Bank, Ltd. v. Seymour, [1955] 2 Lloyd's List L.R. 147 (Q.B.). See Miller, Problems & Patterns of the Letter of Credit, 1959 U. of Ill.L.F. 162 at 170, n. 45.

4. This approach is entirely consistent with Mass.Gen.Laws ch. 106. The Uniform Commercial Code Comment to § 5–102 (3) refers to the Code's canon of "liberal interpretation to promote underlying purposes and policies" (§ 1–102 (1) and (2)), and states, with respect to it, that "Since the law of letters of credit is still developing, conscious use of that canon and attention to fundamental theory by the court are peculiarly appropriate."

5. Filley v. Pope, 115 U.S. 213, 6 S.Ct. 19, 29 L.Ed. 372 (1885) (shipment from Leith v. shipment from Glasgow) ; Caloric Stove Corp. v. Chemical Bank & Trust Co., 205 F.2d 492 (2d Cir. 1953) (steel v. cold rolled prime steel sheets) ; Crocker First Nat'l Bank of San Francisco v. DeSousa, 27 F.2d 462 (9th Cir. 1928) (Java sugar v. Java refined sugar) ; Wells Fargo Nevada Nat'l Bank of San Francisco v. Corn Exchange Nat'l Bank, 23 F.2d 1 (7th Cir. 1927) (invoice v. invoice with accompanying bill of lading and Java weight certificates) ; Mitsubishi Goshi Kaisha v. J. Aron & Co., 16 F.2d 185 (2d Cir. 1926) ("Dallas to East Rochester" v. "f. o. b. * * * Pacific Coast") ; International Banking Corp. v. Irving Nat'l Bank, 283 F. 103 (2d Cir. 1922) (" * * * striped Fuji silk * * * as per your sample 400 * * *." v. " * * * made as per our designs and total width of stripes not more than 50% of the material width.") ; Banco Nacional

What we face here is a matter of procedure which can, in the first instance, be structured by the purchasing party. How may a buyer in the international market place be assured before payment that his purchase as delivered is of the quality agreed upon by the parties? As buyers become more concerned about quality, this issue is likely to become more important. That there are so few cases or comments addressed to the issue of reasonable precautions to assure quality is indicative of the relatively novel status of the problem, at least so far as courts have dealt with it. We are mindful of the testimony in this case that an official of appellee, a busy bank, engaged in passing upon the issuance of 1,500 to 2,000 letters of credit a year for several decades, has encountered in this case his first experience with a letter of credit calling for a certificate of conformity to the order.

What are the realities of such a requirement on the part of the buyer? It is not enough that he receive the quantity of goods he ordered, nor that he receive goods capable of standard measure or grade. He must also, in such a case as this, receive them cut, tailored, sewn according to a style he has in mind. He must therefore rely on a sample he has seen and liked. Being in a distant part of the globe, the buyer must usually elect one of two alternatives. He may be present during the inspection process to verify the sample or he may select, with his seller's acquiescence, a person or firm in whom he has confidence to represent him. Unless he elects to be present, he is acting on faith—faith that the representative is capable and honest, and faith that the representative has the right samples or criteria to serve as a standard. Even if he mails an approved sample direct to the representative, he must rely on the integrity of the mails.

This act of faith—or its converse, the risk that merchandise will not turn out as hoped—is that of the buyer. As one contemporary student has written,

"* * * there is one risk against which protection is required and which is less easy to guard against. That is the risk that the goods shipped may not comply with the terms of the sales contract as to quality. This is a risk which normally the buyer will have to bear * * * but * * * [he] can guard against the risk by requiring in his letter of request to the bankers that, in addition to the usual shipping documents, the vendor shall deliver a certificate of quality showing the goods to be as specified in the contract, signed by some responsible person at the place of shipment. The only risk then left to the buyer is that the person nominated to give the certificate may fail in his duty. But an entire absence of risk would mean an absence of business." A. G. Davis, The Law Relating to Commercial Letters of Credit, 3d ed., London, Sir Isaac Pitman & Sons Ltd., 1963, p. 19.

Or, in the words of other scholars,

"The requirement of such other documents, and particularly certificates of analysis, quality, weight, and the like, is a reasonable precaution for a prudent buyer to take, since he may in this way obtain some measure of assurance that the merchandise is as ordered * * *. The bank is under no obligation and bears no responsibility for the accuracy of any such representations and certificates. Never-

Ultramarino v. First Nat'l Bank of Boston, 289 F. 169 (D.Mass.1923) (white crystal sugar v. Brazil white crystal sugar); Brown, Graves & Co. v. Ambler, 66 Md. 391 (1887) (yellow pine lumber v. yellow pine flooring); Bank of Italy v. Merchants Nat'l Bank, 236 N.Y. 106, 140 N.E. 211 (1923) (raisins v. dried grapes); Lamborn v. Lake Shore Banking & Trust Co., 231 N.Y. 616, 132 N.E. 911 (1921) (Java white sugar v. Java white granulated sugar); National City Bank v. Seattle Nat'l Bank, 121 Wash. 476, 209 P. 705, 30 A.L.R. 347 (1922) (granulated white sugar, no. 24 v. standard white granulated sugar); J. H. Rayner & Co. v. Hambro's Bank, Ltd., [1943] 1 K.B. 37 ("* * * machine-shelled groundnut kernels" v. "Coromandel groundnuts"); Bank Melli Iran v. Barclays Bank, 2 T.L.R. 1057 (1951) (goods "new" v. "100 new, good * * *.").

theless, through selection of a reputable third party, the buyer does have a degree of assurance that the merchandise is as represented." Ward and Harfield, Bank Credits and Acceptances, 4th ed., Ronald Press, 1958, p. 45.

These observations go to the heart of this case. For the buyer here—Lawrence—was striving to assure the delivery of quality goods. To be sure, it deliberately postponed the problem when it caused the letters of credit to be issued without resolving the question of the inspecting agent. Then it naively sought to have the sellers accept one of its own representatives. It had long since sewn the seeds of dispute by sending to the sellers both "stock sheets" which were really orders and "orders" which were merely preliminary papers. When it finally reached agreement with the seller as to an inspecting agency, it neglected to specify precisely how it would conduct the inspection operation, leaving only the bland instruction that the goods must conform to orders. And, so far as the inspecting agency was concerned, the orders merely referred to samples that might very well have been inspected in Spain at some past time.

Consequently when faced on the eve of the shipping deadline both with a barrage of contradictory telegrams from the buyer and with samples which the sellers under oath stated "corresponded" with samples approved earlier by the buyer's representative in Barcelona, Supervigilancia had to act to the dissatisfaction of one of the parties to the basic contract. That it took the word, under oath, of the seller as to the appropriateness of the sample is no more than any inspector must ordinarily do. Unless the buyer is physically present (and Lawrence presumably could have arranged this during the frenetic two week period of cable traffic), the inspector must take someone's word that he is judging by the proper samples.

Even in the well known case of O'Meara v. National Park Bank, 239 N.Y. 386, 146 N.E. 636, 39 A.L.R. 747, (1925), a letter of credit calling for newsprint to "test 11/12–32 pounds" was held to be satisfied by an affidavit that annexed samples "stated [by the affiant] to be representative of the shipment" met the prescribed test. We fail to see how this is any more reliable than the affidavit of "correspondence" in the instant case.

In Basse & Selve v. Bank of Australasia, 90 L.T.R. (n.s.) 618 (K.B.1904), the letter of credit covering a purchase of cobalt ore called for a certificate of analysis of a local chemist showing at least five per cent protoxide. The shipper (bent on delivering worthless ore) gave the chemist a packet of ore for analysis. The chemist furnished a certificate that the ore he examined contained the requisite amount of protoxide. But the negotiating bank refused to pay since there was nothing to indicate that the ore examined was that described in the bill of lading. The unscrupulous shipper then gave the chemist a packet of ore marked as was the bill of lading, "P.M. 2680 bags representing 100 tons". The chemist then referred in his certificate to "The sample of cobalt ore marked 'P.M. 2680 bags representing 100 tons' received from you * * *." The bank paid the shipper and prevailed in a suit against it by its customer to recover the sum so paid. The court said:

"It is said that [the certificate] professes to show merely the test of the contents of a sample packet with a mark upon it, and does not purport to show a test of the bill of lading of 100 tons of ore. This, I think, is a fanciful objection. Large quantities of produce are necessarily tested by means of samples. Such samples are drawn either by the servants of the owner of the goods or (as it seems) by the servants of the analyst, and if the samples are carefully and skilfully drawn they generally fairly represent the bulk. But in this case it would be no part of the bank's duty to see to the sampling or to ascertain that it was fairly done." 90 L.T.R. (n.s.) at 620.

So we say in this case that, while the sample may be just as misleading as the ore sample in Basse & Selve, the advising bank was equally justified in paying on the strength of the documents.

We see no significant difference in Supervigilancia being told by the manufacturers that the samples were those approved by the buyer and being told that they "corresponded" to such samples. Webster's Dictionary (3d Int'l ed.) gives such meanings of "correspond" as "in agreement", "conformity", "equivalent", "match", "equal". In the context and considering the language difficulty, we think these meanings apply more than the looser ones like "analogous", "parallel", or "similar". In effect, Lawrence in this case, by providing as a referent to the letter of credit requirement of conformity to orders merely the early cryptic description on the stock sheets ("Coats * * * to be as samples inspected in Spain"), procured no more reliable assurance of authenticity than the credit termination clause in Fair Pavilions, Inc. v. First Nat'l City Bank, 24 A.D.2d 109, 264 N.Y.S.2d 255 (1965), which was to be triggered " * * * if our Travelers Letter of Credit Department receives * * * from an officer (or one describing himself therein as an officer) of [bank's customer] an affidavit that one or more * * * events * * * has occurred." 264 N.Y.S.2d at 256.

Moreover, if there be ambiguity surrounding the words "correspond" or "sample approved in Spain" we would, like the court in *Fair Pavilions*, " * * * take the words as strongly against the issuer as a reasonable reading will justify. * * *." Supra at 258.

To hold otherwise—that a buyer could frustrate an international transaction on the eve of fulfillment by a challenge to authenticity of sample—would make vulnerable many such arrangements where third parties are vested by buyers with inspection responsibilities but where, apart from their own competence and integrity, there is no iron-clad guarantee of the sample itself.[6]

As for the argument that Supervigilancia's finding that the goods conform "to the conditions stipulated on the Order-Stock-sheets" is a meaningful variance from the terms of the letters of credit, we confess to semantic myopia. "The conditions" mean, as we read the certificates, all the conditions, hence the order itself. As for the dual use by the agency of the words "Order-Stock-sheets", we have already indicated both the nature and cause of the confusion and conclude that Supervigilancia acted solomonically in borrowing the substance of the stock sheets and the label of the "orders". We do not see how it could have done otherwise.

The remaining contention that "under reserves" has some mysterious meaning which infects the entire certificate is not borne out by the inapposite cases cited to us and is directly refuted by the limiting language immediately following—"not as far as the goods are concerned". Further reading of the document indicates clearly that the phrase was directed to the underlying dispute between buyer and seller, which could not be the concern of the advising bank.

We hold, therefore, that the inspection certificate in this case conformed in all significant respects to the requirements of the letter of credit.

Appellee has urged that, in the event we might reverse the district court's judgment, the case should be remanded

---

6. This would also in effect undermine the letter of credit device and make the negotiating bank a judge between claims of vendor and vendee. If an issuing bank at the behest of a vendee " * * * is not obliged to assume the burdens of a controversy between the vendor and vendee", Laudisi v. American Exchange Nat'l Bank, 239 N.Y. 234, 243, 146 N.E. 347, 350 (1924), a fortiori we think a negotiating bank should be spared the ordeal. For, after all, it is "the purchasing bank * * * [which knows] nothing of the buyer and perhaps nothing of the seller, [and] acts entirely in reliance on the credit of the issuing bank." Continental Nat'l Bank v. National City Bank, 69 F.2d 312, 316 (9th Cir. 1934).

for a new trial or at least further findings, since the district court did not find it necessary to reach additional defenses. Appellant urges otherwise. It is not clear to us which is correct. We reverse the judgment of the District Court and remand for such further proceedings, consistent with this opinion, as the court feels appropriate. We do say that these additional defenses were not argued before us, nor directly passed upon, but whether this is chargeable to appellee, so that judgment should be entered for appellant forthwith, we leave to the district judge before whom this case was originally heard.