EXOTIC TRADERS FAR EAST
BUYING OFFICE, Plaintiff,

v.

EXOTIC TRADING U.S.A., INC., &
BayBank Boston, N.A., Defendants.

BAYBANK BOSTON, N.A., Third
Party Plaintiff,

v.

Burton M. KAUFMAN, Third
Party Defendant.

Civ. A. No. 86–2663–T.

United States District Court,
D. Massachusetts.

Jan. 10, 1989.

Phillips, Cloth & Branson, Jeffrey J. Phillips, Boston, Mass., for plaintiff.

Malcolm J. Portnoy, Randolph, Mass., for Exotic Trading U.S.A., Inc.

Lawrence J. Crowley, Jr., Riemer & Braunstein, Boston, Mass., for BayBank Boston, N.A.

## MEMORANDUM

TAURO, District Judge.

This case involves two different contracts for the sale of goods between the plaintiff, Exotic Traders Far East Buying Office (hereinafter "seller")[1], and defendant, Exotic Trading U.S.A. Inc. (herein-

1. At the close of the bench trial in this matter, seller moved to amend its complaint to conform to the evidence. That motion is now granted.

after "buyer"). Payment for the goods, electronic stun guns and holsters, was secured via two irrevocable documentary letters of credit issued by BayBank Boston.

BayBank's refusal to honor demands for payment under either of the letters of credit and the buyer's failure to pay for the goods gave rise to seller's complaint. Buyer counterclaimed against seller for breach of contract. BayBank cross-claimed against buyer for indemnification and asserted a third party claim against Burton Kaufman, buyer's sales agent, as guarantor of the two letters of credit. All claims were tried together without a jury. This memorandum constitutes this court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### I.

In May 1985, seller agreed to sell to buyer 2,000 holsters. The total price was $2,200. Kaufman obtained an irrevocable documentary letter of credit from BayBank for $2,200 (L.C. 6598–MID). To obtain payment under the letter of credit, the beneficiary[2] was required to present a thirty day sight draft accompanied by the following documents: 1) a signed commercial invoice; 2) a special U.S. Customs invoice; 3) a packing list; 4) an inspection certificate signed by seller; 5) a signed air waybill; and 6) a copy of a telex sent one day prior to shipment covering the holsters, F.O.B. Seoul. The telex was required to state: The cost of goods, date of shipment, air waybill number, estimated date of arrival, airline, master air waybill number and number of cartons.

The holsters were shipped on June 13, 1985 and arrived in the United States on June 14, 1985. Buyer sold the goods in transit to Intermark Trading[3] which took possession of them. Neither buyer nor Intermark Trading paid for the goods.

On June 21, 1985, Yakjin Corp., the manufacturer/assignee, made a demand for payment on the $2,200 letter of credit. Although the demand was accompanied by all the required documents, they varied in two aspects from the literal terms of the letter of credit: 1) the telex required by the letter of credit was sent one day after shipment of the goods, rather than one day before shipment; and 2) the commercial invoice indicated the goods had been shipped "F.O.B. Korea", rather than "F.O.B. Seoul". Relying on these discrepancies, BayBank refused the demand for payment.

### II.

The second sale of goods was essentially the same as the first. In September 1985, seller agreed to sell to buyer 3,000 electronic stun guns for a total price of $30,000. Kaufman obtained an irrevocable documentary letter of credit from BayBank for $30,000 by amending an already issued letter of credit. (L.C. 6666–MID). To obtain payment under this letter of credit, the beneficiary had to present essentially the same type of documents as were required in the first transaction.[4]

The stun guns were shipped on October 12, 1985, and arrived in the United States on October 14, 1985. Buyer again sold the goods in transit to Intermark Trading which took possession of them. Seller has not been paid for the goods.

On October 17, 1985, Yakjin Corp. made a demand for payment on the $30,000 letter of credit. The demand was accompanied by all the required documents. Again,

2. Originally seller was the beneficiary of this letter of credit, as well as the letter of credit securing the stun guns. To obtain production of the goods, seller transferred its beneficial interest in both letters of credit to Yakjin Trading Corporation, the maker of the guns and holsters, by advices of total transfer. After the bank refused to honor the demand for payment, that Yakjin made on both letters of credit, Yakjin assigned its causes of action for wrongful dishonor to seller for $5,600. Consequently, seller is the proper party to maintain this action.

3. This was, essentially, a paper transaction. Intermark Trading is a company that Kaufman uses for importing goods so they are insured by his company's bond.

4. The differences between documents required under the first letter of credit and those required under the second are not material to the issues of this case.

there were two discrepancies between the documents presented and the literal terms of the letter of credit: 1) the required telex was sent on the day of shipment, rather than one day prior to shipment; and 2) the telex did not contain the cost of goods sold. Because of these discrepancies, Baybank refused the demand for payment.

### III.

Both letters of credit present the same question: May BayBank refuse to honor these demands for payment because of the variations between the documents presented and the literal terms of the letters of credit.

Massachusetts requires that a demand for payment comply strictly with the terms of a letter of credit. *E.g., Banco Espanol de Credito v. State Street Bank & Trust Co.*, 385 F.2d 230, 237 (1st Cir.1967), *cert. denied*, 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968) ("documents submitted incident to a letter of credit are to be strictly construed"). Two decisions of this circuit, however, make clear that a bank may not reject a demand for payment on the basis of a hypertechnical reading of a letter of credit. *See Banco*, 385 F.2d 230; *Flagship Cruises, Ltd. v. New England Merchants National Bank*, 569 F.2d 699 (1st Cir.1978).

In *Banco*, the letter of credit required a certificate stating that "the goods were in conformity with the order." The certificate that was presented stated that the goods were found "conforming to the conditions. stipulated on the order-stock sheets." The court found that this discrepancy was not enough to justify the bank's refusal to pay on the letter of credit. The court reasoned that, to foster international transactions, courts must balance the need for predictability with the need for a realistic approach. *Banco*, 385 F.2d at 234.

In *Flagship Cruises*, there were three discrepancies between the presented documents and the terms of the letter of credit: 1) the draft was drawn by the wrong entity (Flagship Cruises, Inc. instead of Flagship Cruises, Ltd.); 2) the draft did not contain a statement that the draft was in conjunction with certain collateral documents (as required by the letter of credit); and 3) the draft did not say it was drawn under "NEMNB Credit No. 18506" but rather simply identified "No. 18506". 569 F.2d at 703–04. The court held that the bank could not rely on these discrepancies to deny payment. As the court stated:

> We do not see these rulings as retreats from rigorous insistence on compliance with letter of credit requirements. They merely recognize that a variance between documents specified and documents submitted is not fatal if there is *no* possibility that the documents could mislead the paying bank to its detriment.

*Id.* at 705.

Applying the teachings of *Banco* and *Flagship Cruises*, this court holds that the discrepancies between the documents that Yakjin presented were not of sufficient variance with the terms of the letters of credit to justify BayBank's refusal to pay. None of the discrepancies in the presentment documents could have misled anyone.

Each telex was to be sent the day before the goods were shipped. The holster telex was sent the day after the goods were shipped. The stun gun telex was sent the same day the goods were shipped. Nevertheless, both telexes indicate that they were received before the goods were due to arrive in this country. Consequently, Bay-Bank knew that both telexes had served their intended purpose of notifying the buyer of shipment, so as to avoid the accrual of warehouse fees. The fact that the telexes were sent a matter of hours late is, therefore, of no substantive significance.

As has been pointed out, BayBank asserts a second line of defense as to both transactions. The commercial invoice for the holsters indicated that the shipment was "F.O.B. Korea", rather than "F.O.B. Seoul". The stun gun telex failed to mention the cost of the goods. Nevertheless, the other presentment documents in each transaction clearly rectified these technical variances.

All the other documents presented with the demand for payment on the holster

letter of credit, including the packing list, special U.S. Customs invoice, certificate of origin and the air waybill, indicated that the holsters had been shipped from Seoul, Korea. Moreover, even the commercial invoice indicated that the goods were loaded at the port of Seoul.

Similarly, the documents presented with the demand for payment on the stun gun letter of credit, including the commercial invoice, packing list, special U.S. Customs invoice, certificate of origin, inspection certificate, and the air waybill, indicated that the price of the goods was $30,000.

Considered as a whole, and in context, the documents for each transaction complied with the terms of the respective letters of credit and could not have misled anyone. *See Banco,* 385 F.2d at 234 ("courts now cast their eyes on a wider scene than a single document"). Accordingly, there was no valid reason for Bay-Bank to refuse payment. Technical inconsistencies between the documents presented and those specified under a letter of credit do not justify the undermining of an otherwise valid commercial transaction. *See Flagship Cruises,* 569 F.2d at 705. Consequently, BayBank is liable to seller for the full amount of the two letters of credit, $32,200.

■ As a consequence, this court holds that buyer is liable to BayBank on the cross-claim for the full $32,200, as well as reasonable attorney's fees, pursuant to the customer agreement. Additionally, Kaufman is liable for the same sum, in accordance with the guaranty agreement he executed.

### IV.

■ Having determined that BayBank is liable to seller for the face value of both letters of credit, it remains to be seen whether buyer is jointly and severally liable for that sum, because of its failure to pay for the goods. Buyer's defense, and its counterclaims, are based on its assertion that seller breached the underlying sales contract. Specifically, buyer alleges that the stun guns that were delivered were improperly configured, and that seller breached an exclusive dealing arrangement by selling other stun guns in the United States. Additionally, buyer contends that the stun gun defect rate was excessive, and that seller failed to replace allegedly defective units.

Kaufman testified that seller, through its agent Paul Hyman, had agreed to ship a new configuration of the stun guns prior to the $30,000 transaction. Additionally, he maintained that buyer had an exclusive right to market seller's stun guns in the United States, an agreement that seller breached. On both these points Kaufman's testimony was in conflict with that of Hyman. Indeed, Hyman maintained that there was no agreement either to sell buyer the new configuration or for an exclusive dealing arrangement. The two men who negotiated the deal, therefore, now differ as to its terms. On this pure question of credibility, the court credits Hyman's testimony and finds that seller did not breach the contract.

Finally, the evidence does not support buyer's contention that an excessive percentage of the stun guns were defective. As a matter of fact, Kaufman could not recall the total number of stun guns that were sold, nor what percentage of them were defective. Consequently, all buyer's counterclaims,[5] and its defenses fail. We are left with a buyer who contracted for and received goods, but did not pay for them. Accordingly, buyer is liable for their full cost, $32,200.

An order will issue.

---

5. In addition to finding that buyer failed to prove its counterclaims, this court also finds that those counterclaims were not properly brought. It is axiomatic that only a corporation's board of directors can engage the corporation in litigation. M.G.L. ch. 156B, § 54 (all powers of a corporation not specifically reserved to the shareholders are exercised exclusively by the board of directors). Buyer's board of directors did not authorize the filing of the counterclaims in this suit. Only Kaufman, a sales agent who was neither an officer nor a director of the defendant corporation, authorized the counterclaims. Because he had no authority to do so, the counterclaims were not properly before this court.

## ORDER

For the reasons set forth in the accompanying memorandum, judgment is hereby entered:

1) for the plaintiff, both on its claims and on defendant Exotic Trading U.S.A., Inc.'s counterclaims;

2) for defendant BayBank Boston, N.A., on its cross-claim against defendant Exotic Trading U.S.A., Inc. and on its third party claim against Burton Kaufman.

IT IS SO ORDERED.